# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FOREST COUNTY POTAWATOMI
COMMUNITY,

               Plaintiff,

               v.

RYAN ZINKE, *Secretary, United States
Department of the Interior, et al.*,

               Defendants.

Civil Action No. 14-2201 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Forest County Potawatomi Community, a federally recognized Native American tribe located in Crandon, Wisconsin, filed ten requests, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for information relating to a competitor tribe's unsuccessful application to open a gaming establishment. Pl.'s Statement of Undisputed Material Facts & Resps. to Defs.' Statement of Undisputed Material Facts ("Pl.'s SUMF") ¶¶ 19, 37–118, ECF No. 49-2. The FOIA requests were submitted to three components of the U.S. Department of the Interior ("DOI")—the Bureau of Indian Affairs' ("BIA") Central Office ("BIA-Central") and Midwest Regional Office ("MWRO"), and Office of Indian Gaming ("OIG"). *Id.*[1] The gaming application died, but the FOIA requests live on. In response to the plaintiff's requests, DOI released over 22,954 pages of information. *Id.* ¶ 139. Dissatisfied, the

---

[1] The plaintiff sued the U.S. Department of the Interior, Bureau of Indian Affairs ("BIA"); BIA's Office of Indian Gaming; BIA's Central Office; Sally Jewel, Secretary of the Interior, in her official capacity; Kevin Washburn, Assistant Secretary for Indian Affairs, in his official capacity; Paula Hart, Director, Office of Indian Gaming, in her official capacity; and Diane Rosen, Regional Director for the Midwest Region Bureau of Indian Affairs, in her official capacity. Pursuant to Federal Rule of Civil Procedure 25(d), federal employees named in their official capacities are automatically substituted. Accordingly, Ryan Zinke is substituted for Sally Jewell, Michael Black is substituted for Kevin Washburn, and Tammie Poitra is substituted for Diane Rosen.

1

plaintiff sued the defendants to compel disclosure of nine documents withheld in full or part and to challenge the adequacy of the agencies' search procedures. Pending before this Court are the parties' cross-motions for summary judgment. *See generally* Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 44; Pl.'s Cross-Mot. Summ. J., ECF No. 49. The defendants' motion is granted in part and denied in part, and the plaintiff's motion is denied.

## I.    BACKGROUND

Contextual background for the FOIA requests at issue is helpful in understanding the scope and timing of the requests, and the agencies' rationale for the searches conducted and withholdings. Consequently, the statutory framework for, and participation in, commercial gaming activities of both the plaintiff and the Menominee Indian Tribe of Wisconsin ("Menominee") are briefly reviewed before turning to the legal challenges to the defendants' responses to plaintiff's FOIA requests.

### A.    Overview of Statutory Framework Governing Indian Gaming

The records sought in this action concern the Menominee's application to engage in gaming operations on land approximately 35 miles from the plaintiff's gaming facility in Wisconsin.[2]  Under the Indian Reorganization Act ("IRA"), the Secretary of DOI "is authorized, in his discretion, to acquire . . . any interest in lands, water rights, or surface rights to lands . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108; *see also Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 461 (D.C. Cir. 2007) ("[T]he Secretary may acquire lands for the purpose of providing land for Native Americans."). The IRA further

---

[2]    The land the Menominee sought to acquire, known as the Dairyland Greyhound Park, is located in Kenosha, Wisconsin, Pl.'s SUMF ¶¶ 2, 8, approximately 35 miles from Milwaukee, where the plaintiff operates a gaming facility, *id.* ¶ 15.  The distance between the two locations is judicially noticed, as "not subject to reasonable dispute because" this distance "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

specifies that "[t]itle to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired." 25 U.S.C. § 5108. Under the Indian Gaming Regulatory Act ("IGRA"), "gaming regulated by [the IGRA] shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). Notwithstanding this provision, a tribe may conduct gaming on trust land acquired after 1988 when, as relevant here, the Secretary determines after a consultation process that "a gaming establishment on newly acquired lands" both (1) "would be in the best interest of the Indian tribe and its members" and (2) "would not be detrimental to the surrounding community." *Id.* § 2719(b)(1)(A). This exception may be granted "only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." *Id.*

In practice, the Secretary makes this two-part determination after a tribe submits an application for a gaming exemption to the applicable BIA Regional Office, which develops and sends a recommendation to OIG. Pl.'s SUMF ¶ 2. OIG then conducts its own review and prepares a draft two-part determination for consideration and final decision by the Assistant Secretary for Indian Affairs. *Id.*

**B.    The Menominee's Gaming Application**

In 2004, the Menominee "filed an off-reservation gaming acquisition application with [MWRO] requesting that the Secretary acquire in trust approximately 228 acres of land" in Kenosha, Wisconsin for gaming purposes. *Id.* ¶¶ 8, 15. "The site of the proposed casino is located approximately 190 miles from the Menominee's gaming facility in Northern Wisconsin," and the "Menominee's existing gaming facility is located approximately 160 miles north of the [plaintiff's] casino in Milwaukee, [Wisconsin]." *Id.* ¶ 26. MWRO entered into a three-party

agreement ("TPA") with a third party contractor, Analytical Environmental Services ("AES"), and the Menominee to undertake preparation of Environmental Impact Statements ("EISs") required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, as part of the Menominee's gaming application. Decl. of Scott Doig ("First MWRO Decl.") ¶¶ 6, 9, 11, 16, ECF No. 45-1. AES was responsible "only for the delivery of draft and final EIS documents." *Id.* ¶ 16.

The Secretary denied the Menominee's application to acquire the land in trust on January 7, 2009. Pl.'s SUMF ¶ 29. Thereafter, the Menominee sued DOI challenging the denial, which lawsuit was resolved in 2011 with an agreement that DOI would withdraw its denial letter and reconsider the Menominee's application. *Id.*

Following further review, DOI conveyed to the Governor of Wisconsin, on August 23, 2013, a Secretarial Determination, ECF No. 49-25, that gaming at the Kenosha location would be in the Menominee's best interest and not detrimental to the surrounding community. *See id.* ¶ 14. On January 23, 2015, the Governor conveyed to the Secretary his non-concurrence with DOI's determination, prompting DOI to recognize formally, on June 1, 2015, that the Kenosha site could not be acquired in trust. *Id.* ¶ 124.

### C.     The Plaintiff's FOIA Requests

As this process unfolded, the plaintiff filed ten FOIA requests for documents concerning the Menominee's gaming application with BIA-Central, MWRO, and OIG. Pl.'s SUMF ¶¶ 37–118. These requests sought "to obtain the Supplemental Information submitted by Menominee or its third party contractor, Analytical Environmental Services ('AES'), regarding the Kenosha Casino Application" in order to "provide meaningful comments on the Kenosha Casino Application . . . by the comment deadlines." Pl.'s Cross-Mot. Summ. J., Ex. 3, Decl. of April E.

Olson ("Plaintiff Decl.") ¶ 4, ECF No. 49-3. In response to this multiple FOIA requests, the defendants produced 22,954 pages of documents. Pl.'s' SUMF ¶¶ 18, 139. Despite the volume of this production, the plaintiff filed the instant suit challenging both the adequacy of the search and the withholdings. *Id.* ¶ 126.

The defendants withheld 71 documents, pursuant to FOIA Exemptions 3, 4, 5, and 6, for reasons set out in a *Vaughn* Index. *See Vaughn* Index, ECF No. 45-2.[3] The plaintiff does not contest the defendants' withholdings under Exemptions 3, 5, and 6, except as to segregable portions of such documents. Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Resp. Defs.' Mot. Summ. J. ("Pl.'s Mem.") at 5 & n.2, 7, 24–25, ECF No. 49-1; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 1, 15–16, ECF No. 60. At issue, then, are the plaintiff's challenges to withholdings under Exemption 4 and the adequacy of the defendants' searches for responsive documents. The plaintiff raises the following five grounds for relief, claiming the defendants: (1) improperly withheld six documents under Exemption 4, Pl.'s Mem. at 1; (2) failed to produce or identify in their *Vaughn* Index two documents that the plaintiff "knows to be in [d]efendants' possession," *id.*;[4] (2) failed to release reasonably segregable information from documents withheld in their entirety, *id.* at 7; (3) failed to search AES's computer networks for responsive documents, *id.* at 1; and (4) engaged in a pattern and practice of violating FOIA, *id.* at 2.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[3]     "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015). The 71 entries in the *Vaughn* Index appear to include some duplicates since, for example, *Vaughn* Rows 17, 22, 29 and 38 refer to a document titled *Menominee Report on Impact of Kenosha*, without any indication that the documents differ in any way.

[4]     As described in more detail, *infra* n.5, the plaintiff originally complained about five missing documents, but three were ultimately disclosed, leaving only two such documents at issue.

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). Indeed, the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). Reflecting the necessary balance between the public's interest in governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010), the FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice (CREW)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (finding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05 (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) ("In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by

evidence of agency bad faith.'" (alteration adopted) (quoting *Consumer Fed'n of Am.*, 455 F.3d at 287)); *CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting an affidavit that "'describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith'" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision.") (internal citation omitted). While "an agency's task is not herculean" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson*, 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to

verify the validity of each claimed exemption." *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). In addition, the court has an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the segregability issue *sua sponte*") (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *Stolt–Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.") (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III. DISCUSSION

The plaintiff challenges the sufficiency of the defendants' responses to the ten FOIA requests at issue, raising issues as to the adequacy of the search, explanations for withholdings, and delays in responding. Specifically, whether the defendants conducted an adequate search turns on whether (1) their failure to search records held by AES was improper and (2) their search's failure to turn up two documents the plaintiff knew to exist means it necessarily was inadequate. These issues are addressed first, before turning to whether the defendants (3) improperly withheld or redacted five documents under Exemption 4, (4) failed to disclose all

reasonably segregable portions of three documents that they withheld in full, and (5) engaged in a policy or practice of violating FOIA.

## A. The Adequacy of DOI's Search

The plaintiff complains that the defendants' search was inadequate because the search (1) failed to locate two documents the plaintiff knew to exist because the documents were attached to the Secretarial Determination, and (2) did not include documents held by defendants' contractor AES. *See* Pl.'s Reply at 11–14, 17–19. These issues are addressed following review of the applicable legal standard. For the reasons that follow, the defendants have met their burden to show that the search was adequate as to the AES records, but they must either perform an additional search for responsive documents or provide a supplemental *Vaughn* Index or declaration explaining the withholdings of the two documents attached to the Secretarial Determination.

### 1. Failure to Locate Documents

The plaintiff asserts that the defendants' search was unreasonable or inadequate because the defendants did not produce or identify in response to FOIA Requests Nos. 6, 9, and 10, two documents attached to the Secretarial Decision, namely: the *KlasRobinson Final Report* (Feb. 12, 2012) and a letter, dated June 19, 2013, from Craig Corn, Chairman, Menominee Indian Tribe of Wisconsin, to Troy Woodward, Office of Indian Gaming, with supporting exhibits ("*Corn Letter*").[5] *See* Pl.'s Mem. at 23–24; Pl.'s Reply, at 13 & n.12; Pl.'s SUMF ¶ 117.

---

[5] The plaintiff initially challenged the defendants' withholding of three other documents attached to the Secretarial Determination as well, but has since acknowledged that only the *KlasRobinson Final Report* and *Corn Letter* remain at issue. Pl.'s Reply at 13 & n.12. The plaintiff acknowledges that the defendants might have produced these documents in entirely redacted form, although "it is impossible to know due to the complete redaction of documents and due to Defendant's failure to update their *Vaughn* Index to identify the documents withheld and the grounds for withholding." *Id.* at 13 n.13. In any event, the plaintiff waives any challenge to the redactions on these three documents, *id.* at 12–13 & n.11, and, thus, the defendants are entitled to summary judgment as to those documents.

According to the plaintiff, these documents were "specifically requested" in Request No. 10, which sought "*[a]ll records listed in the . . . Attachment List to the [Secretarial] Determination*," Pl.'s Reply at 14 (emphasis in original); Pl.'s SUMF ¶ 117, and, consequently, the defendants should be required "to perform an additional search to locate and disclose these missing records," and to produce both documents and/or identify withholdings in their *Vaughn* Index, Pl.'s Mem. at 24; Pl.'s Reply at 13−14.

The defendants assert the "well-settled" principle that "the identification of potentially responsive documents that were not identified in response to a request is not proof of an unreasonable or inadequate search." Def.'s Opp'n Pl.'s Cross-Mot. Summ. J. & Reply Supp. Def.'s Mot. Summ J. ("Defs.' Reply") at 8, ECF No. 59 (citing *DiBacco*, 795 F.3d at 191−92; *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)). Further, the defendants point out that the "documents Plaintiff [seeks] . . . were produced to Plaintiff in response to yet another FOIA request," one of the ten at issue, and that the plaintiff's request for an additional search to produce these documents thus is moot. *Id.* at 9.[6] In other words, the defendants do not dispute that the records are responsive and are non-exempt from disclosure. The defendants cite to nothing in the record, however, showing that these two documents were produced, and the plaintiff denies that the *KlasRobinson Final Report* and the *Corn Letter* were either produced or identified as withheld. Pl.'s Reply at 12−13 & n.12.

This dispute raises a genuine issue of material fact as to the adequacy of the defendants' search, requiring denial of both the defendants and plaintiff's motions for summary judgment. The defendants' suggestion that this issue is "moot" is predicated on their assumption that the

---

[6] In addition, the defendants argued that most of the documents attached to the Secretarial Determination "were not part of the search parameters" because they "post-date the FOIA requests at issue." Defs.' Reply at 9. This argument fails because the plaintiff's Reply focuses on Request No. 10, which was submitted after the Secretarial Determination issued. *See* Pl.'s SUMF ¶ 117.

two documents, the *KlasRobinson Final Report* and *Corn Letter*, were actually produced, but the defendants have not shown that such production occurred.

Nevertheless, the defendants assert that "BIA has met the reasonableness standard in conducting its search for records concerning the Menominee Indian Tribe's Kenosha Casino application and various documents required as a part of the gaming application process," and cite to declarations detailing their process of searching for records responsive to the plaintiff's FOIA requests. Defs.' Mem. at 6; *see generally* First MWRO Decl.; Defs.' Mot., Ex. 2, Decl. of Michelle R. Corbine, MWRO's FOIA Coordinator ("Second MWRO Decl."), ECF No. 44-2; *id.*, Ex. 4, Decl. of Kayla Danks, MWRO's Realty Officer ("Third MWRO Decl."), ECF No. 44-4; *id.*, Ex. 3, Decl. of OIG Director Paula Hart ("DOI OIG Decl."), ECF No. 44-3. An agency is not entitled to summary judgment, however, if "a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials.'" *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) (quoting *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (internal quotation marks and citations omitted); *see also Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 738 (D.C. Cir. 2017).

In this case, the plaintiff submitted a "well defined" request for all records attached to the Secretarial Determination. *See* Pl.'s SUMF ¶ 117; *Valencia-Lucena*, 180 F.3d at 326 (quoting *Founding Church of Scientology of Wash. D.C., Inc., v. Nat'l Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979)). That the Secretarial Determination listed the *KlasRobinson Final Report* and *Corn Letter* as attachments makes clear that these documents exist, Secretarial Determination at 53–54, and the defendants do not dispute their existence, *see* Defs.' Reply at 9; indeed, they claim, without any record evidence, to have already produced these documents. *Id.* These constitute "positive indications of overlooked materials" that preclude a grant of summary

judgment to the defendants. *Valencia-Lucena*, 180 F.3d at 326 (quoting *Founding Church of Scientology*, 610 F.2d at 837). The defendants have not sustained their burden of showing their searches' adequacy, and so are not entitled to summary judgment as to this claim. They may either supplement their declarations to address the genuine issues of material fact the plaintiff raises as to the *KlasRobinson Final Report* and the *Corn Letter*, or else perform an additional search to locate these missing records. *See Pub. Citizen v. U.S. Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 98 (D.D.C. 2013) (directing defendant to "either supplement its declarations to address the factual questions raised by the plaintiff . . . or perform an additional search" where "the defendant was or became aware" while conducting its search that additional responsive reports "should exist," yet "offer[ed] no explanation, and cite[d] to no produced document, to account for the missing records").

### 2.    Records Held by Contractor AES

The parties also dispute whether AES internal records are "agency records" for the purpose of FOIA's disclosure requirements. *See* Pl.'s Mem. at 34; Defs.' Reply at 9. The plaintiff seeks an order requiring the defendants to conduct a search for records responsive to Request No. 7, of internal AES records as "likely includ[ing] information and analysis relating to AES's preparation of" records and documents ultimately provided to the BIA. Pl.'s Mem. at 25−26.[7]

The defendants argue that the MWRO "conducted a reasonable search for AES files" by "provid[ing] emails between its employees and AES, as those emails were incorporated into the agency's files, but did not conduct a search of AES's internal files because those files do not

---

[7]    Request No. 7 sought "[a]ll records produced by or held by AES or its subcontractors relating to the BIA, the Menominee Tribe, the Menominee Tribe's business partners and its third party agent, AES, including counsel or representatives of the foregoing, regarding the National Environmental Policy Act review and evaluation process conducted by AES for the Menominee Tribe's Kenosha Casino Project." Pl.'s Reply at 26.

meet the standard for agency records." Defs.' Mem. at 8; First MRWO Decl. ¶¶ 17–24. The defendants aver that "they lack the authority to command [AES] to retain or dispose of AES's records," and that because the plaintiff "cannot point to a specific document custody arrangement between AES and Defendants, it is reasonable that potentially responsive documents may remain solely within AES's custody and control, meaning [d]efendants' search was adequate and [d]efendants are entitled to summary judgment." Defs.' Reply at 9.

Records held by third-party contractors may under certain circumstances be "agency records." This inquiry does not turn on who created the document or where the document is currently located. Rather, to qualify as "agency records," requested documents must satisfy two requirements: the agency must (1) "either create or obtain the requested materials" and (2) "be in control of [them] at the time the FOIA request is made." *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989)) (alteration in original) (internal quotations omitted). "The burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records' or have not been 'improperly' 'withheld.'" *Tax Analysts*, 492 U.S. at 142 n.3 (citing S. REP. NO. 89-813, at 8 (1965)). For the reasons that follow, the Court finds that AES's internal records are not "agency records" subject to the disclosure requirements of FOIA.

### a) *Creating or Obtaining Requested Materials*

An agency "created or obtained" records possessed by third-party firms when "the extensive supervision and control exercised by the agency over collection and analysis of the data indicates that these [third-party] firms acted on behalf of [the agency] in creating the [records]." *Burka*, 87 F.3d at 515. The defendants assert that they lacked access to AES's internal records and never sought documents from any subcontractor. *See* First MRWO Decl. ¶¶ 16–19, 21–23. Furthermore, MWRO "considered the records which were internal to and

controlled by AES . . . as non-government records, since the records were created by a non-federal entity." Second MWRO Decl. ¶ 117. The plaintiff counters that the BIA "created or obtained" the AES internal records because AES was a contractor that "'acted on behalf of' the [BIA]." *See* Pl.'s Mem. at 27 (citing *Burka*, 87 F.3d at 515; *ExxonMobil Corp. v. Dep't of Commerce*, 828 F. Supp. 2d 97, 106 (D.D.C. 2011); *Chi. Tribune Co. v. U.S. Dep't of Health & Human Servs.*, No. 95 C 3917, 1997 WL 1137641, at *13 (N.D. Ill. Mar. 28, 1997)). As support, the plaintiff notes that under the TPA, "AES agree[d] to act as the project manager *on behalf of the BIA*," and BIA served as "Lead Agency," Pl.'s Mem. at 28 (quoting Plaintiff Decl., Ex. M ("TPA Exhibit") § 5.0, ECF No. 49-16 (emphasis added)), and, further, that "[DOI] regulations and Council on Environmental Quality ('CEQ') regulations[] both required BIA to retain ultimate responsibility for the preparation of environmental documents and independently evaluate such documents," *id*. at 28−29 (citing; 40 C.F.R. § 1506.5(a), (c); 43 C.F.R. § 46.105). As such, the plaintiff argues, AES created the internal records the plaintiff seeks "on behalf of" the defendants and under their "extensive supervision and control." *Id*.

The plaintiff's points are well taken. AES "acted on [BIA's] behalf" in serving as project manager, TPA Exhibit § 5.0, meaning that any internal documents created by AES in the course of serving as project manager were made on BIA's behalf as well. BIA thus exercised "extensive supervision and control" over AES's "collection and analysis of the data." *Burka*, 87 F.3d at 515. As such, the defendants "created or obtained" AES's internal records for purposes of FOIA's disclosure rules even though these records "were neither created by agency employees, nor [we]re they currently located on agency property." *Id*. That the defendants did not understand AES's internal records to be agency records, *see* Second MWRO Decl. ¶ 117, is immaterial—the objective nature of an agency-third party relationship, not the agency's

subjective understanding of a document's status, controls whether an agency "created or obtained" the document.  *See Burka*, 87 F.3d at 515.

> b)    *Agency control of the AES internal documents at the time the FOIA request was made*

A document that an agency "created or obtained" is not an "agency record" within FOIA's meaning if the agency lacked "control of [them] at the time the FOIA request [wa]s made." *Id.* (quoting *Tax Analysts*, 492 U.S. at 144 (internal quotation marks and citation).  Four factors determine whether an agency controlled records at the time of a FOIA request:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 926–27 (D.C. Cir. 2011) (quoting *Burka*, 87 F.3d at 515).  The D.C. Circuit "has adopted a totality of the circumstances test" to determine whether documents are "agency records."  *Consumer Fed'n of Am.*, 455 F.3d at 287. Courts apply this test "mindful that the 'core purpose of the FOIA' is to 'contribut[e] significantly to public understanding *of the operations or activities of the government.*'"  *Judicial Watch, Inc.*, 646 F.3d at 928 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 775 (1989) (alternation and emphasis in original) (internal quotation marks omitted)).  The plaintiff argues that three of the four factors weigh in favor of finding that BIA has "control" over the internal AES records.  Pl.'s Reply at 17.

The first factor, "the intent of the document's creator to retain or relinquish control over the records," weighs in a requester's favor when a third-party firm transfers documents to an agency "with full knowledge that the agency might use them."  *Judicial Watch, Inc.*, 646 F.3d at 926–27 (quoting *Burka*, 87 F.3d at 515).  BIA explains that neither BIA nor AES "intended for

internal AES documentation to be provided to BIA as part of the contract," but rather, intended only for AES to turn over to BIA "actual deliverables – namely, draft and final EIS documents." First MRWO Decl. ¶ 17. The plaintiff asserts that BIA "ordered the creation of" the EIS documents as "Lead Agency" and "necessarily retained ultimate responsibility and control over these documents." Pl.'s Mem. at 30–31 (citing *Burka*, 87 F.3d at 515). Although AES knew BIA might use the particular deliverables AES agreed to provide BIA, the record does not show that AES intended to provide BIA other *internal* documents. In fact, BIA and AES did not expect BIA to obtain access to or control over internal AES documents. First MRWO Decl. ¶ 17. BIA sought only the EIS and related documents, and MWRO produced those documents in response to the plaintiff's FOIA requests. *Id*. ¶ 22. The first factor thus weighs in the defendants' favor.

As to the second factor, "the ability of the agency to use and dispose of the record as it sees fit," *Judicial Watch, Inc.*, 646 F.3d at 926–27 (quoting *Burka*, 87 F.3d at 515), BIA explains that "MWRO has no direct access to AES'[s] internal documents (aside from those transmitted to [MWRO])" and thus "MWRO cannot use the documents, nor can MWRO require AES to dispose of the documents." First MRWO Decl. ¶ 20. The plaintiff argues that MWRO had implicit access to internal AES pursuant to the TPA, which "provided that AES would provide 'technical direction, review, and quality control for the preparation of the Scoping Report, EIS, technical studies, and other NEPA-related documents,'" and that BIA would review "'[w]ork in progress, deliverables, and finished products . . . for accuracy, completeness, compliance with required standards, and responsiveness to the requirements of this agreement.'" Pl.'s Mem. at 31 (quoting TPA Exhibit §§ 5.0, 7.0) (alteration in original). The plaintiff observes that AES routinely provided to BIA documents that, in the plaintiff's view, show BIA had "the ability to

obtain, use, and dispose of AES records as it saw fit." *Id*. Moreover, the plaintiff points out that the TPA allowed BIA to provide review and quality control over AES's work. *Id*. at 32. Finally, the plaintiff argues as a policy matter that to allow agencies "to avoid disclosure under FOIA by setting limits on their access and control over documents created and held by their contractors on their behalf" effectively "would shield an agency from public scrutiny where the agency delegated sensitive assignments to independent contractors yet effectively created, obtained, and controlled the work." *Id*. (quoting *Chi. Tribune* 1997 WL 1137641, at *16).[8]

Notwithstanding the legitimate concerns implicated by the plaintiff's arguments, the second factor weighs against the plaintiff's assertion that internal AES documents were "agency records." Here, the defendants lacked the ability to use or dispose of internal AES documents as they saw fit. *See* First MRWO Decl. ¶ 19–20 (asserting that BIA "cannot use the documents" or "require AES to dispose of the documents"). AES's submission of some documents to BIA does not show that the defendants could use or dispose of different, internal AES documents as they saw fit. The TPA allowed BIA to provide technical direction, review, and quality control with respect only to "the Scoping Report, EIS, technical studies, and other NEPA-related documents," not all internal AES documents related to the casino project. TPA Exhibit § 5.0. Likewise, the TPA allowed BIA to review "for accuracy, completeness, compliance with required standards, and responsiveness to the requirements of this agreement" only "[w]ork in progress, deliverables, and finished products," not all internal AES documents related to the project. *Id*. § 7.0. Moreover, even if the defendants could have demanded access to AES's internal documents, this would not make such internal documents subject to FOIA. "[D]ocuments an agency had the

---

[8]     The plaintiff's reliance on *Chicago Tribune* is misplaced. In that case, the agency did not deny that it could use or dispose of the contractor's documents at issue and, in fact, directed the contractor to provide some information for the FOIA request. 1997 WL 1137641, at *14–15. The defendants here lacked such control.

right to acquire [do] not become agency records subject to FOIA 'unless and until the right is exercised.'" *Judicial Watch, Inc.*, 646 F.3d at 928 (citing *Forsham v. Harris*, 445 U.S. 169, 181).

As to the third factor, "the extent to which agency personnel have read or relied upon the document," *id.* at 927 (quoting *Burka*, 87 F.3d at 515), the defendants assert that because they lacked direct access to AES internal records, they did "not rely upon those documents in making its decisions." First MRWO Decl. ¶ 21. The plaintiff counters that (1) MWRO was obligated to review AES records because BIA was contractually obligated to review AES "work in progress" and provide technical direction, and (2) the defendants necessarily relied on internal AES records because AES assisted the defendants in preparing the EIS, with related analyses and documents, as well as the Secretarial Determination, which cited the final EIS. Pl.'s Mem. at 33. Although BIA reviewed and relied upon certain AES documents in drafting the EIS and Secretarial Determination, the plaintiff identifies no evidence that the defendants relied on undisclosed internal AES documents. To the contrary, the evidence shows that the defendants did not read or rely on internal AES documents. First MRWO Decl. ¶ 17, 19, 21–22.

As to the fourth factor, "the degree to which the document was integrated into the agency's record system or files," *Judicial Watch, Inc.*, 646 F.3d at 927 (quoting *Burka*, 87 F.3d at 515), only documents sent to or received by the BIA—not internal AES documents—were incorporated into the BIA's files. First MRWO Decl. ¶ 22. The defendants also note that AES and DOI had no agreement "whereby [DOI] maintains custody and control over all AES documents relevant to Plaintiff's FOIA requests." Defs.' Reply at 10. The plaintiff believes that the defendants had constructive or actual control over AES's internal documents, but acknowledges not knowing whether AES records were integrated into the defendants' record

keeping system. Pl.'s Mem. at 33. Nonetheless, in light of the defendants' invocation of Exemption 5 to withhold certain communications with AES as inter- or intra-agency records, the plaintiff contends this "confirms" that internal AES documents are agency records. *Id.* at 34−35. Yet, whether information the defendants and AES communicated between each other are inter- or intra-agency records does not bear on whether internal information that AES did not disclose to the defendants are agency records.

For these reasons, the defendants lacked control of internal AES records at the time of the FOIA requests. Accordingly, the plaintiff's challenge to the adequacy of the defendants' search on this basis fails.

## B.    Documents Withheld Under Exemption 4

The plaintiff challenges the defendants' withholding, under Exemption 4, of the following six documents: (1) *KlasRobinson Preliminary Report* (Feb. 9, 2012) (*Vaughn* Index Rows 28, 30, 39, 63); (2) *Memorandum of Agreement* (*Vaughn* Index Rows 27, 37); (3) *Menominee Report on Impact of Kenosha* (*Vaughn* Index Rows 17, 22, 29, 38); (4) *Use of Funding Data* (*Vaughn* Index Row 14); (5) *Interim Report—LaFollette School of Public Affairs* (*Vaughn* Index Row 18); and (6) *KlasRobinson Rebuttal Report* (*Vaughn* Index Row 63).[9] Pl.'s Mem. at 33. Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Where withheld records do not contain trade secrets, an agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential" to sustain the burden of showing that Exemption 4 was properly applied. *Pub. Citizen Health*

---

[9]     The *Vaughn* Index identifies the *KlasRobinson Rebuttal Report* as withheld under Exemption 5, *see Vaughn* Index at 28, but that appears to have been a typographical error. The *Vaughn* Index also identifies this document only as *KlasRobinson Report*, but the plaintiffs describe this to be a rebuttal report, *see* Pl.'s Mem. at 19−20; Pl.'s SUMF ¶ 33, a description adopted here for specificity's sake.

*Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). All parties agree "that documents received from Menominee are 'obtained from a person,'" Pl.'s Mem. at 8 (citing Defs.' Mem. at 11),[10] and contest only whether the withheld documents (1) contain "commercial" materials and are (2) "confidential." *Id.*

### 1. Whether The Withheld Documents Are "Commercial"

FOIA does not define the term "commercial" used in Exemption 4 and, thus, the D.C. Circuit has instructed that "the term[] 'commercial' . . . in this exemption should be given [its] ordinary meaning[]." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290; *see also Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002); *accord Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). "[I]nformation is commercial under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders,* 309 F.3d at 38 (citing *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)) (internal quotation marks omitted). "[R]ecords that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business" contain "commercial" information. *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290. Yet, "Exemption 4 is *not* confined only to records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business,'" *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (emphasis is original) (quoting *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290), but "reaches more broadly and applies . . . when the

---

[10]     Under 5 U.S.C. § 551(2), a "'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency." *Id.*

provider of the information has a commercial interest in the information submitted to the agency," *id*. (citing *Nat'l Ass'n of Home Builders*, 309 F.3d at 38–39).

The defendants have met their burden of showing that the six documents withheld under Exemption 4 contain commercial or financial information. Gaming, as a general matter, is "commercial . . . by its nature," particularly in connection with establishing a casino as a "commercial enterprise." *Nat'l Ass'n of Home Builders*, 309 F.3d at 39. Moreover, information relating to this project is commercial "in its function," as the Menominee have "a commercial interest at stake in its disclosure." *Id*. This conclusion is fully supported by the declarations submitted by the defendants describing the commercial or financial information contained in each of the six disputed documents. The *KlasRobinson Preliminary Report* contains "projected revenues of a gaming facility," as well as "information regarding: traffic patterns in and around the proposed Kenosha Facility, demographic and population statistics related to persons living within various distances from the proposed Kenosha Facility," which is pertinent to evaluating potential revenue streams," and the "description of gaming facilities, projected size and phasing of the Kenosha Facility, and projected breakdown of revenue and expenses of the Kenosha Facility." Defs.' Opp'n. Pl.'s Cross-Mot. Summ. J., Ex. 2, Decl. of Joan R. Delabreau, Chairperson of the Menominee Tribal Legislature ¶¶ 7–8 ("Menominee Decl."), ECF No. 58-2. The *Memorandum of Agreement* contains "information regarding the rights and liabilities of both the Menominee Kenosha Gaming Authority and the Menominee Indian Tribe." *Id*. ¶ 13. The *Menominee Report on Impact of Kenosha* contains "information regarding detailed analysis of Tribal assets and their potential for development, an analysis of how potential Kenosha Casino gaming revenue would be used, and information on long term . . . business, and economic[,] goals of the Menominee Tribe," *id*. ¶ 9, as well as "documents summarizing the Tribes' financial

decision" and summaries of financial documents, DOI OIG Decl. ¶ 74. The *Use of Funding Data* contains "projected revenues of a gaming facility," Menominee Decl. ¶ 7, as well as "documents summarizing the Tribes' financial decision" and summaries of financial documents found in the other withheld and redacted documents, DOI OIG Decl. ¶ 74. The *Interim Report— LaFollette School of Public Affairs* contains "information regarding detailed analysis of Tribal assets and their potential for development, an analysis of how potential Kenosha Casino gaming revenue would be used, and information on long term [Menominee] business[] and economic goals." Menominee Decl. ¶ 9. Finally, the *KlasRobinson Rebuttal Report* contains "information regarding: traffic patterns in and around the proposed Kenosha Facility, demographic and population statistics related to persons living within various distances from the proposed Kenosha Facility, description of gaming facilities, projected size and phasing of the Kenosha Facility, and projected breakdown of revenue and expenses of the Kenosha Facility." *Id.* ¶ 8.[11]

Notwithstanding these descriptions of the commercial or financial information contained in each of the six disputed documents, the plaintiff asserts that the withhold information in these six documents "is not 'commercial or financial,' because the information relates to the Menominee's governmental operations, and thus 'is commercial neither by its nature (having been created by the government rather than in connection with a commercial enterprise) nor in its function (as there is no evidence that the parties who supplied the . . . information have a commercial interest at stake in its disclosure).'" Pl.'s Mem. at 17−23 (citing *Nat'l Ass'n of Home Builders*, 309 F.3d at 39).[12] This argument is predicated on a false dichotomy. Simply

---

[11]     The defendants stress the obvious context that the "[p]laintiff wants the proprietary information of a rival group – submitted at the behest of [DOI] – to better compete against that rival." Defs.' Reply at 5. Even if so, "agencies must generally release requested records without regard to the identity or motive of the requestor." *Chiquita Brands Int'l Inc., v. S.E.C.*, 805 F.3d 289, 294 (D.C. Cir. 2015).

[12]     The plaintiff's reliance on *National Association of Home Builders* for this proposition is misplaced. Pl.'s Mem. at 17−18 (quoting *Nat'l Ass'n of Home Builders*, 309 F.3d at 39). In that case, a statute forbade sale of the records at issue, and the "quid-pro-quo exchange between governmental entities" by which the federal government

put, governmental and commercial information are not mutually exclusive categories, and, accordingly, information provided by a tribal government relating to governmental operations does not preclude such information from being commercial or financial. *See, e.g.*, *Flathead Joint Bd. of Control v. U.S. Dep't of Interior*, 309 F. Supp. 2d 1217, 1220 (D. Mont. 2004) (concluding that information submitted by a tribe to BIA relating to a tribe's water rights negotiating position, materials supporting their water rights claims, and information that maximizes their negotiating position was "commercial" information); *Merit Energy Co. v. U.S. Dep't of Interior*, 180 F. Supp. 2d 1184, 1188 (D. Colo. 2001) (concluding that information relating to the computation of royalties assessed on production of oil and gas on a tribe's reservation was "clearly" "commercial or financial" information).

For these reasons, the defendants have met their burden with respect to the first prong of the test to determine whether Exemption 4 is properly applied to withhold information from the five documents here.

### 2. Whether The Withheld Documents Are "Confidential"

To invoke Exemption 4, the defendants must show that the withheld information, in addition to being "commercial," is "privileged" or "confidential." 5 U.S.C. § 552(b)(4). The defendants contend that the withheld information is "confidential." Defs.' Mem. at 10–11. Different tests apply to voluntarily and involuntarily submitted documents in determining whether information is "confidential." *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992). "Commercial or financial matter" that an entity

obtained them was not, in the D.C. Circuit's opinion, "a commercial transaction in the ordinary sense." 309 F.3d at 38–39. For these reasons, the records at issue were held not to be "commercial or financial." *Id.* Information on casino operations and related land acquisition, business planning, and revenue predictions, in contrast, fall within the ordinary meaning of "commercial." *See Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982) ("[B]usiness information was Congress's primary concern.").

submits to the government *involuntarily* may be deemed "confidential" under Exemption 4 if the information's disclosure is likely "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 873 (quoting *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)) (alterations omitted). By contrast, "financial or commercial information provided to the Government on a *voluntary* basis," is "'confidential' for the purpose of Exemption 4" merely if the information "is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Id.* at 879 (emphasis added). Thus, the threshold determination to be made is whether the Menominee submitted the six disputed documents voluntarily or involuntarily.

"[A]ctual legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the character of submissions" as voluntary or involuntary." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001). Although the D.C. Circuit has not formulated a test for determining whether documents were voluntarily or involuntarily submitted, an entity has been held to submit documents involuntarily when "any legal authority compels its submission, including informal mandates that call for the submission of the information as a condition of doing business with the government." *Lepelletier v. FDIC*, 977 F. Supp. 456, 460 n.3 (D.D.C. 1997), *aff'd in part, rev'd in part, & remanded on other grounds*, 164 F.3d 37 (D.C.Cir.1999). "In contrast, documents collected by a government agency merely to aid in 'formulating effective policies' [are] voluntarily submitted for Exemption 4 purposes." *Soghoian v. Office of Mgmt. & Budget*, 932 F. Supp. 2d 167, 175 (D.D.C. 2013) (alterations omitted) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Commerce,* 337 F. Supp. 2d 146, 171 (D.D.C. 2004)). A tribe's decision to apply for a license to

operate an off-reservation casino is plainly voluntary, but then, having chosen to apply, the Menominee committed themselves to complying with all information submission requirements that the law imposed. The documents at issue were submitted to the government as required by the gaming application process, and so were submitted involuntarily. The defendants concede as much. Defs.' Mem. at 12 ("In the instant case, the information was turned over to the government as a requirement in the application process. . . . Thus, the proper standard is whether the information would: (1) impair the Government's ability to obtain necessary information in the future, or (2) cause substantial harm to the competitive position of the person from whom the information was obtained."). The confidentiality standard for involuntarily-submitted documents thus governs.

> a)    *The Defendants' Ability to Obtain Necessary Information*

The first prong of the confidentiality standard for involuntarily-submitted information asks whether the information's disclosure "is likely to . . . impair the Government's ability to obtain necessary information in the future." *Critical Mass Energy Project*, 975 F.2d at 873 (quoting *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770). The defendants argue that although tribes currently submit detailed financial statements to DOI as part of off-reservation gaming license applications, if information in these applications were not protected from disclosure to rival tribes, tribal applicants would be deterred from making such detailed submissions and "would only submit very broad, cursory financial information, which would hinder the agency's ability to determine the extent to which a casino would benefit the tribe." DOI OIG Decl. ¶ 67. The plaintiff rejects this reasoning since the information was obtained through a mandatory submission and tribes would risk having their applications rejected by submitting low-quality information. Pl.'s Mem. at 10–11. Though a close call, the plaintiff has the better argument.

Generally, "the governmental impact inquiry . . . focus[es] on the possible effect of disclosure on [the] quality" of information supplied. *Ctr. for Auto Safety*, 244 F.3d at 148 (quoting *Critical Mass Energy Project*, 975 F.2d at 878). "When the Government obtains information as part of a mandatory submission, the Government's access to the information normally is not seriously threatened by disclosure." *Id.*; *see also Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770 ("[D]isclosure of this material . . . is a mandatory condition of the concessioners' right to operate in national parks. Since the concessioners are required to provide this financial information to the government, there is presumably no danger that public disclosure will impair the ability of the Government to obtain this information in the future.").

To be sure, a tribe applying for an off-reservation gaming license might understandably be reluctant to submit information that the tribe knows may be disclosed publicly. Indeed, the Menominee's Chairperson has asserted that she would recommend submitting less detailed information in future off-reservation gaming applications if information of the sort that the six documents contain is released. Menominee Decl. ¶ 6. In this case, however, regulations governing off-reservation gaming applications require submission of specific commercial or financial information, *see, e.g.*, 25 C.F.R. §§ 151.11(c), 292.17(a), (j)(2)-(3), 292.18(g), and failure to provide sufficiently specific, detailed, and relevant information would adversely affect any approval of a gaming application. Accordingly, the disclosure of the information in the six documents cannot be found to pose serious risk to the government's ability to obtain similar information in the future from the Menominee or any other tribe seeking approval for off-reservation gaming. *See Ctr. for Auto Safety*, 244 F.3d at 148.

### b) *Likelihood of Substantial Competitive Harm*

Since the defendants cannot show that disclosure of the withheld information would impair the government's ability to obtain necessary information in the future, Exemption 4 may

only be invoked successfully here upon a showing that disclosure likely would cause the Menominee substantial competitive harm. *Id.* The defendants satisfy that burden by showing disclosure likely would substantially injure the Menominee with respect to actual competition.

Substantial competitive harm is "limited to harm flowing from the affirmative use of proprietary information *by competitors*," *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 n.30 (emphasis in original), and "requires a showing of both" (1) actual competition and" (2) "a likelihood of substantial competitive injury," *Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1331 (D.C. Cir. 2014). "In reviewing an agency's determination as to substantial competitive harm," courts "recognize that 'predictive judgements are not capable of exact proof,'" and "generally defer to the agency's predictive judgments as to 'the repercussions of disclosure.'" *United Techs. Corp.*, 601 F.3d at 563 (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1191 n.4 (D.C. Cir. 2004)).

The defendants contend that disclosure of the withheld and redacted information would cause the Menominee substantial competitive harm, DOI OIG Decl. ¶ 68, a position also urged by the Menominee, Menominee Decl. ¶¶ 7–13. According to the defendants, disclosure of the withheld information in the six documents would give gaming competitors "insight into the actual or projected financial plans" of the Menominee and allow such competitors "to use such information to gain an advantage in the gaming marketplace." DOI OIG Decl. ¶ 68. Additionally, the Menominee express a continuing interest in opening a casino in Kenosha, Wisconsin, noting that the tribe has in effect a gaming compact with the State of Wisconsin authorizing gaming pursuant to approval under the IGRA, and has even intervened as a party in *Forest County Potawatomi Community v. United States*, 317 F.R.D. 6 (D.D.C. 2016), "to protect

only be invoked successfully here upon a showing that disclosure likely would cause the Menominee substantial competitive harm. *Id.* The defendants satisfy that burden by showing disclosure likely would substantially injure the Menominee with respect to actual competition.

Substantial competitive harm is "limited to harm flowing from the affirmative use of proprietary information *by competitors*," *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 n.30 (emphasis in original), and "requires a showing of both" (1) actual competition and" (2) "a likelihood of substantial competitive injury," *Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1331 (D.C. Cir. 2014). "In reviewing an agency's determination as to substantial competitive harm," courts "recognize that 'predictive judgements are not capable of exact proof,'" and "generally defer to the agency's predictive judgments as to 'the repercussions of disclosure.'" *United Techs. Corp.*, 601 F.3d at 563 (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1191 n.4 (D.C. Cir. 2004)).

The defendants contend that disclosure of the withheld and redacted information would cause the Menominee substantial competitive harm, DOI OIG Decl. ¶ 68, a position also urged by the Menominee, Menominee Decl. ¶¶ 7–13. According to the defendants, disclosure of the withheld information in the six documents would give gaming competitors "insight into the actual or projected financial plans" of the Menominee and allow such competitors "to use such information to gain an advantage in the gaming marketplace." DOI OIG Decl. ¶ 68. Additionally, the Menominee express a continuing interest in opening a casino in Kenosha, Wisconsin, noting that the tribe has in effect a gaming compact with the State of Wisconsin authorizing gaming pursuant to approval under the IGRA, and has even intervened as a party in *Forest County Potawatomi Community v. United States*, 317 F.R.D. 6 (D.D.C. 2016), "to protect

[the tribe's] rights related to future gaming in Kenosha, Wisconsin." Menominee Decl. ¶¶ 14, 16–17.[13]

The defendants identify specific competitive concerns regarding release of the six disputed documents. For example, release of the *KlasRobinson Preliminary Report* "would benefit any Indian Tribe interested in pursuing an off-reservation casino in Kenosha, Wisconsin to the detriment of the Menominee," *id.* ¶¶ 7–8, "allowing a competitor casino to identify and compete for the key revenue sources and amounts identified in the report," *Vaughn* Index at 15. Production of the *Memorandum of Agreement* "would reveal the legal rights and/or legal commitments of the parties, including information about the financial risk and responsibilities borne by each party." Menominee Decl. ¶ 13; *accord Vaughn* Index at 14. Production of the *Menominee Report on Impact of Kenosha* "would allow a competitor to identify proposed revenue amounts from the Kenosha Casino and the businesses and governmental activities that the [Menominee] proposes to fund with Kenosha Casino revenues," Menominee Decl. ¶ 9, which in turn "would allow a competitor tribe to identify elements of the [t]ribe's long-term plan and acquire key assets or revenue streams in advance of the [t]ribe's ability to do so, thwarting the [t]ribe's economic development and/or driving up the cost to the [t]ribe of purchasing key assets." *Vaughn* Index at 7, 10, 15. Production of the *Use of Funding Data* "would benefit any Indian Tribe interested in pursuing an off-reservation casino in Kenosha, Wisconsin to the detriment of the Menominee," Menominee Decl. ¶ 7, and "cause substantial harm to the competitive position of the Casino and the [t]ribe," *Vaughn* Index at 6. Production of the *Interim Report* "would allow a competitor to identify proposed revenue amounts from the Kenosha

---

[13]      In *Forest County Potawatomi Community*, the plaintiff here seeks to reverse DOI's disapproval of an agreement between the plaintiff and the State of Wisconsin that effectively would have created a fifty-mile zone of noncompetition around the plaintiff's Milwaukee gaming facility. 317 F.R.D. at 9–10. That case serves as further evidence of existing competition between the plaintiff and the Menominee.

Casino and the businesses and governmental activities that the [Menominee] proposes to fund with Kenosha Casino revenues." Menominee Decl. ¶ 9. Release of the *KlasRobinson Rebuttal Report* would "would benefit any Indian Tribe interested in pursuing an off-reservation casino in Kenosha, Wisconsin to the detriment of the Menominee." *Id.* ¶ 8. Finally, release of the *Menominee Report on Impact of Kenosha* and *Interim Report* "would cause competitive harm to the [Menominee] by placing [it] at a disadvantage in any commercial dealings with third parties necessary to accomplish its long term goals by allowing them access to the [Menominee's] priorities and proposed level of funding," allow competitors "to identify elements of the [Menominee's] long-term plan and acquire key assets or revenue streams in advance of the [Menominee's] ability to do so, thwarting the [t]ribe's economic development," and "allow [t]ribes and other persons or entities in competition with the [Menominee's] Kenosha Casino including the [plaintiff] to utilize the [Menominee's] commercial and financial information related to its intended use of Kenosha Casino revenue to bolster public relations or government relations efforts to oppose the Kenosha Casino development." *Id.* ¶¶ 10–12.

The plaintiff points to the fact that the Governor rejected the Menominee's application to build a casino in Kenosha, and argues, on this basis, that the defendants are unable to show any effect on either actual competition or a likelihood of substantial competitive harm. Pl.'s Mem. at 14. Moreover, the Menominee have not renewed its option agreement to purchase the Kenosha site for the planned casino, the property is back on the market, and the Menominee's intergovernmental agreement for the casino with the City and County of Kenosha has expired. *Id.* at 15. Under these circumstances, the plaintiff contends that any future competition the Menominee may face for a gaming operation in Kenosha is "highly speculative," which "is insufficient under Exemption 4." *Id.* at 14–15 (citing *Niagara Mohawk Power Corp.*, 169 F.3d

at 19). In addition, according to the plaintiff, disclosure would not cause substantial competitive harm to the Menominee's existing casino operations, which are located 190 miles from Kenosha, as the information at issue is largely specific to the proposed casino in Kenosha. *Id.* at 15. The plaintiff also asserts that production of the withheld documents would not cause the Menominee substantial competitive harm because the documents are several years old and that the defendants have not explained how the information they contain is still competitively valuable, *id.* at 15–23, noting, in particular, that the *KlasRobinson Preliminary Report* analyzed a public PricewaterhouseCoopers report from 2004 and was discussed in the Secretarial Determination, *id.* at 18–19. These arguments are not persuasive.

The defendants have met their burden to show that the Menominee face actual competition with respect to gaming operations in Kenosha and that production of the withheld documents likely would cause them substantial competitive harm. Despite the Governor of Wisconsin's non-concurrence with DOI's determination, the Menominee continue to seek a gaming operation in Kenosha. Menominee Decl. ¶¶ 14–17. The Menominee thus face not just "future or potential competition," which is "legally inadequate" to justify withholding or redaction information, but "*actual* competition." *Niagara Mohawk Power Corp.*, 169 F.3d at 19. The Menominee is involved in separate litigation with the plaintiff concerning future gaming operations in Kenosha and have evidenced a "continuing commercial interest" in opening a gaming facility in Kenosha in reliance on provisions in its gaming compact with the State of Wisconsin that authorize gaming in Kenosha upon acquisition of land eligible for gaming. Menominee Decl. ¶ 17.

The disputed documents' ages, though relevant, do not alter this conclusion, given that the Menominee continue to seek a gaming operation in Kenosha. The plaintiff cites *Center for*

*Auto Safety v. U.S. Dep't of Treasury*, 133 F. Supp. 3d 109 (D.D.C. 2015), and *Biles v. Department of Health & Human Services*, 931 F. Supp. 2d 211 (D.D.C. 2013)), to argue that the information at issue is too old for its production to cause the Menominee substantial competitive harm. Pl.'s Mem. at 15–16. *Center for Auto Safety* and *Biles* each determined that production of five-year old documents likely would not cause substantial competitive harm, but *Center for Auto Safety*'s analysis rested in meaningful part on the facts that (1) the companies involved had undergone significant bankruptcy restructuring and (2) companies in the industry rarely planned more than five years ahead, 133 F. Supp. 3d at 134, while *Biles*'s analysis rested in meaningful part on the fact that the health care industry had undergone major structural reform due to the Patient Protection and Affordable Care Act's ("ACA") enactment, which altered rebate calculation, 931 F. Supp. 2d at 226. No analogous restructuring has occurred here, nor is there any indication that obtaining an off-reservation gaming license rarely entails planning more than five years ahead. Given the Menominee's continuing interest in a Kenosha gaming operation and the "defer[ence due] to [an] agency's predictive judgments as to 'the repercussions of disclosure,'" *Jurewicz*, 741 F.3d at 1331 (quoting *United Techs.*, 601 F.3d at 563), the defendants have carried their burden to show that production of the disputed documents likely would cause the Menominee substantial competitive harm. The defendants are therefore entitled to summary judgment, on this claim as to each of the withheld documents, except the *KlasRobinson Preliminary Report*.

The defendants have withheld in full the *KlasRobinson Preliminary Report*, even though the Secretarial Determination partially disclosed its contents as part of the Secretarial Determination. Pl.'s SUMF ¶ 35. "To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality—a *sine qua non* of

Exemption 4." *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987); *see also*

*Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981) ("If the information

is freely or cheaply available from other sources . . . it can hardly be called confidential and

agency disclosure is unlikely to cause competitive harm to the submitter."). Thus, the defendants

have not carried their burden to show that production of any part of the report would cause the

Menominee substantial competitive harm. The defendants must release all reasonably

segregable information that the Secretarial Determination already makes publicly available, and

so are not entitled to summary judgment as to this particular document withheld in full.

### C. Segregability

The plaintiff argues that the defendants have not released all segregable information from

three documents: (1) the *KlasRobinson Preliminary Report* (*Vaughn* Index Rows 28, 30, 39), (2)

the *Memorandum of Agreement* (*Vaughn* Index Rows 27, 37); and (3) the *Draft Memo re:*

*Recommendation of Menominee Indian Tribe's Off Reservation Trust Application* (Nov. 5, 2012)

(*Vaughn* Index Row 70). Pl.'s Mem. at 24–25. According to the plaintiff, "[a]t a minimum,

[d]efendants should release the cover pages or headings of these documents, which would likely

indicate information such as the sender, recipient, date, and title of the documents." *Id.*

"FOIA requires that 'any reasonably segregable portion of a record shall be provided to

any person requesting such record after deletion of the portions which are exempt.'" *Morley*,

508 F.3d at 1123 (alteration omitted) (citing 5 U.S.C. § 552(b)). To satisfy its segregability

obligation, "[an] agency must provide a 'detailed justification' for . . . non-segregability," but "is

not required to provide so much detail that the exempt material would be effectively disclosed."

*Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing *Mead Data*

*Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). An agency may

provide sufficient justification by describing the materials withheld, the exemption under which they were withheld, and an affidavit attesting that "it released all segregable material." *Loving v. Dep't of Defense*, 550 F.3d 32, 41 (D.C. Cir. 2008) (holding that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *Johnson*, 310 F.3d at 776.

The defendants assert that "BIA has performed adequate and reasonable searches for responsive records; has processed all such records and released all reasonably segregable non-exempt information from documents responsive to plaintiff's . . . requests that are subject to FOIA; and has properly denied access to records and information pursuant to FOIA Exemptions 3, 4, 5, and 6." Defs.' Mem. at 21. They also assert that any release of non-exempt information in the *Draft Memo* would also reveal information covered under Exemption 5 which is not challenged, and that the *KlasRobinson Preliminary Report* "could not be redacted with any information provided without revealing the substance of the information withheld properly." Defs.' Reply at 7; *see Vaughn* Index at 32. Finally, they assert that the plaintiff's claim is moot with respect to the *Memorandum of Agreement* because they released a redaction version of the document on July 29, 2015. Defs.' Reply at 7.

The defendants have met their burden of showing that they have released all segregable information from the *Draft Memo* and *Memorandum of Agreement*. The *Vaughn* Index entry for the *Draft Memo* asserts that the document cannot be redacted without revealing exempt information, *Vaughn* Index at 32, which suffices to show that the defendants met their burden to "provide a 'detailed justification' for . . . non-segregability." *Johnson*, 310 F.3d at 776 (citing *Mead Data Ctr.*, 566 F.2d at 261). The defendants thus are entitled to summary judgment and

the plaintiff is not entitled to summary judgment on the plaintiff's segregability claim as to those documents. The defendants have also produced the *Memorandum of Agreement* in redacted form. *Vaughn* Index at 14; *Memorandum of Agreement*, ECF No. 60-3. The plaintiff correctly notes that the *Memorandum of Agreement* is entirely redacted, Pl.'s Reply at 15, but does not show that any withheld portion of the document was segregable, and the defendants' assertion that it has released a redacted version of the document, Defs.' Reply at 7, must be understood to implicitly assert that further segregation of disclosable material is not possible. Accordingly, the defendants are entitled to summary judgment as to the *Memorandum of Agreement* as well.

Despite their assertion to the contrary, the defendants identify no attestation they have made, in any declaration or in the *Vaughn* Index, that they have "released all segregable material" from the *KlasRobinson Preliminary Report*. *Loving*, 550 F.3d at 41. As discussed, *supra*, the Secretarial Determination partially disclosed this document's contents. Given the defendants' obligation to release any information reasonably segregable from the *KlasRobinson Preliminary Report*, they are not entitled to summary judgment as to this document and are directed to either produce the document in a less redacted form or clarify their *Vaughn* Index's deficiencies with respect to this document.

### D. Pattern or Practice of Violating FOIA

Finally, the plaintiff argues that the defendants have engaged in a "pattern and practice" of violating FOIA, for which it seeks declaratory and injunctive relief. Pl.'s Mem. at 35. The defendants assert that the "[p]laintiff has not (and cannot) show some general policy or practice whereby [d]efendants have affirmatively elected to not process FOIA requests . . . that would require extraordinary relief." Defs.' Reply at 13.

FOIA requires agencies to "determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and [to] immediately notify the person making such request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i). This deadline may be extended in accordance with FOIA. *See, e.g.*, *id.* § 552(a)(6)(B)(i), (ii). Even when a requester has "obtained relief as to a *specific request* under the FOIA," the requester may raise a "claim that an agency *policy or practice* will impair [its] lawful access to information in the future." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988). A district court may "order relief beyond the simple release of extant records," including "a prospective injunction with an affirmative duty to disclose," *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Justice*, 846 F.3d 1235, 1242 (D.C. Cir. 2017), where "an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the terms of the FOIA, and not merely isolated mistakes by agency officials," *Payne Enters., Inc.*, 837 F.2d at 491.

The plaintiff asserts that the defendants' delays evidence a policy or practice of FOIA noncompliance. Pl.'s Mem. at 35. Specifically, it asserts that the defendants failed to make timely determinations for eight of its ten FOIA requests, identify "the date on which a determination is expected to be dispatched," or offer the plaintiff an opportunity to narrow the scope of its claims or access to a FOIA Public Liaison to aid its requests. *Id.* at 37–39 (citing 5 U.S.C. § 552(a)(6)(B)(i), (ii)) (internal quotation marks omitted). The plaintiff also asserts that the defendants also failed to make records "promptly available," identifying long delays in the defendants' response to its FOIA requests. *Id.* at 41–43 (citing 5 U.S.C. § 552(a)(3)(A); *Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013)). Further, the plaintiff asserts that the defendants failed to make appeal determinations within twenty days, and

even failed to acknowledge or make any appeal determination at all for eight of the ten appeals. *Id.* at 35, 39. Finally, the plaintiff criticizes the defendants for "repeatedly spen[ding] time providing old documents that had been re-submitted by [the] Menominee, notwithstanding . . . repeated requests that they focus on more recent information." *Id.* at 43.

Although the defendants missed many FOIA deadlines and in some cases failed to act altogether, the plaintiff must show that the defendants' delays were not due "merely [to] isolated mistakes by agency officials" to establish a FOIA policy or practice claim. *Payne Enters., Inc.*, 837 F.2d at 491. Significant personnel turnover occurred in late 2012, when many of the FOIA responses at issue were due, and the defendants could not begin searching for responsive documents until March 2013. DOI OIG Decl. ¶ 45. While searching for and reviewing responsive documents "as time allowed," OIG also was processing the Menominee's gaming application, "7 other . . . applications for gaming, 47 class III tribal state gaming compacts, 2 Secretarial Procedures, and 41 Revenue Allocation Plans." *Id.* ¶ 46.

The plaintiff's complaint that the defendants did not release requested materials until late July 2012, in response to FOIA Request No. 2 made in early June 2012, Pl.'s Mem. at 41−42, seems almost frivolous since this delay is brief, this request's scope was broad, and the defendants gave multiple partial responses throughout June and July. Plaintiff Decl. ¶¶ 40–41; Pl.'s SUMF ¶ 55. The plaintiff asserts that it did not receive final responses as to FOIA Requests No. 4, 6, and 9 until July 2015, but concedes that it received partial responses in February and December of 2014. Pl.'s Mem. at 42 n.13. Though this delay was more significant, the defendants requested that the plaintiff narrow the scope of these requests, which sought "'any and all documentation and communication' over a five year period of time," as they were "overly burdensome and vague," and would require searching 47 storage boxes over a period of years.

Plaintiff Decl. ¶¶ 71–72; DOI OIG Decl. ¶ 31. The plaintiff also complains that the defendants repeatedly produced "old documents that had been resubmitted by [the Tribe]," even though the plaintiff had asked that the government focus on more recent information. Pl.'s Mem. at 43. To the extent, however, that the plaintiff requested documents that were duplicates of earlier submitted documents, so long as those documents were resubmitted after September 9, 2009, the defendants fulfilled their FOIA obligations. Plaintiff Decl. ¶ 13. In any event, the plaintiff fails to show that the defendants' production of duplicative documents amounted to a "policy or practice" of FOIA noncompliance. *Payne Enters., Inc.*, 837 F.2d at 491. Finally, the plaintiff complains that it "specifically and repeatedly requested OIG's October 17, 2011 letter to [the] Menominee," but that the defendants did not produce this letter until June 17, 2015, over three years after the plaintiff had initially requested it. Pl.'s Mem. at 43; Pl.'s SUMF ¶¶ 9, 54. An agency's delay in complying with this request for this specific document, however, simply does not rise to the level of establishing a pattern and practice by the defendant agencies of refusing to comply with their FOIA obligations, especially in light of the tremendous volume of responsive records disclosed to the plaintiff here. Cf. *Payne Enters., Inc.*, 837 F.2d at 494 (allowing pattern and practice claim where agency simply refused to release of responsive records where no FOIA exemption applied).

Given this background and close examination of the plaintiff's specific complaints about delays in the defendants' responses, the plaintiff has failed to establish a policy or practice of FOIA noncompliance and, accordingly, the defendants are entitled to summary judgment and the plaintiff is not entitled to summary judgment as to this claim.

## IV.  CONCLUSION

The defendants' Motion for Summary Judgment is denied as to the plaintiff's claims for (1) an additional search for the *KlasRobinson Final Report* and *Corn Letter,* and (2) production of all segregable portions of the *KlasRobinson Preliminary Report*, and otherwise granted in full. The plaintiff's Cross-Motion for Summary Judgment is denied in full.

An appropriate Order accompanies this Memorandum Opinion.

**Date**: September 30, 2017

_____
BERYL A. HOWELL
Chief Judge